350 F.3d 932
 PACIFIC GAS AND ELECTRIC COMPANY, a California corporation; PG & E Corporation, Plaintiffs-Appellees,
v.
People of the State of CALIFORNIA, ex. rel. CALIFORNIA DEPT OF TOXIC SUBSTANCES CONTROL, Central Coast Regional Water Quality Control Board, Colorado River Basin Regional Water Quality Control Board, State Water Resources Control Board, Lahontan Regional Water Quality Board, Central Valley Regional Water Quality Control Board, San Francisco Bay Regional Water Quality Control Board, North Coast Regional Quality Control Board, California Dept Fish and Game, California Dept of Forestry and Fire Protection, California Dept Water Resources, California Environmental Protection Agency, California Highway Patrol, California Dept of Education, Bay Conservation Development Commission, Resources Agency, State Lands Commission, California Dept of Parks and Recreation, California Dept General Services, California Coastal Commission; People of the State of California, ex. rel. California Dept Transportation; City and County of San Francisco; California Hydropower Reform Coalition; California Public Utilities Commission, Defendants-Appellants, and
City of Redwood City; California Counties of Alameda, Fresno, Kern, Sacramento, San Luis Obispo, Santa Barbara, Santa Clara, Siskiyou, Sonoma, and the City and County of San Francisco; United States of America, on behalf of the U.S. Environmental Protection Agency; Official Committee of Unsecured Creditors, Defendants.
People of the State of California, ex. rel. California Dept Transportation; City and County of San Francisco; California Hydropower Reform Coalition; California Public Utilities Commission, Petitioners,
v.
Pacific Gas and Electric Company, a California corporation, Respondent.
 No. 02-16990.
 No. 02-80113.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted May 14, 2003 — San Francisco, California.
 Filed November 19, 2003.
 As Amended December 9, 2003.
 
 James L. Lopes, Amy E. Margolin, Howard, Rice, Nemerovski, Canady, Falk and Rabkin, Stephen L. Johnson, United States Department of Justice, San Francisco, California; Laurence H. Tribe, Harvard University Law School, Cambridge, Massachusetts; Michael Kessler, Weil, Gotshall and Manges, New York, New York; Alan Shore Gover, Dewey Ballantine, Houston, Texas, Stephen L. Johnson, United States Department of Justice, San Francisco, California, for plaintiff-appellee/respondent Pacific Gas and Electric.
 Thomas Greene, Margarita Padilla, Office of the Attorney General, Oakland, California; Steven H. Felderstein, Paul J. Pascuzzi, Felderstein Fitzgerald Willoughby, Sacramento, California; Bruce A. Behrens, California Department of Transportation, San Francisco, California; Theresa L. Mueller, D. Cameron Baker, San Francisco City Attorney's Office, San Francisco, California; Richard Roos-Collins, Natural Heritage Institute, Berkeley, California; Charlton H. Bonham, Trout Unlimited, Albany, California; Alan W. Kornberg, Paul, Weiss, Rifkind, Wharton & Garrison, New York, New York; Arocles Aguilar, Gary M. Cohen, Public Utilities Commission of the State of California, San Francisco, California, for defendants-appellants/petitioners State of California, et al.
 Robert D. McCallum, Jr., Assistant Attorney General, Kevin V. Ryan, United States Attorney, William Kanter, Jeffrey Clair (argued), U.S. Department of Justice, Civil Division, Appellate Staff, Washington, DC, Jonathan V. Holtzman, Renne & Holtzman, San Francisco, California; Mary H. Williams, State of Oregon Justice Department, Salem, Oregon, for amici curiae.
 Appeal from the United States District Court for the Northern District of California; Vaughn R. Walker, District Judge, Presiding.
 Before: MICHAEL DALY HAWKINS, WILLIAM A. FLETCHER, Circuit Judges, and SAMUEL P. KING,* Senior Judge.
 OPINION
 WILLIAM A. FLETCHER, Circuit Judge:
 
 
 1
 The issue presented in this interlocutory appeal is the extent to which a reorganization plan proposed under 11 U.S.C. § 1123(a)(5) preempts otherwise applicable nonbankruptcy law. Section 1123(a) was enacted as part of the Bankruptcy Code in 1978. That section specifies what must be included in a reorganization plan under Chapter 11 and closely parallels § 216(10) of the predecessor Bankruptcy Act. Section 1123(a)(5) provides, in part, "[n]otwithstanding any otherwise applicable nonbankruptcy law a [reorganization] plan shall ... provide adequate means for the plan's implementation[.]" When § 1123(a) was originally enacted in 1978, it did not contain the clause "notwithstanding any otherwise applicable nonbankruptcy law," just as § 216(10) of the Bankruptcy Act contained no such clause. The "notwithstanding" clause was added to § 1123(a) by amendment in 1984.
 
 
 2
 Section 1142(a) was also enacted as part of the Bankruptcy Code in 1978. That section prescribes duties associated with the implementation of an approved reorganization plan under Chapter 11 and closely parallels § 224(2) of the predecessor Bankruptcy Act. Section 1142(a) provides, "[n]otwithstanding any otherwise applicable nonbankruptcy law, rule, or regulation relating to financial condition, the debtor and any entity organized or to be organized for the purpose of carrying out the plan shall carry out the [reorganization] plan and shall comply with any orders of the court." The only relevant difference between § 1142(a) and its predecessor § 224(2) is that the clause "notwithstanding any otherwise applicable non-bankruptcy law, rule, or regulation relating to financial condition" was added in 1978.
 
 
 3
 We hold that a reorganization plan proposed under § 1123(a)(5) expressly preempts otherwise applicable non-bankruptcy laws only to the extent that such laws were already preempted before the addition of the "notwithstanding" clause to § 1123(a) by amendment in 1984. That is, we hold that the addition of the "notwithstanding" clause to § 1123(a) was merely a clarification and confirmation of the preemptive effect of a reorganization plan that already existed under the 1978 Bankruptcy Code. That preemptive effect, expressly stated in the "notwithstanding" clause of § 1142(a), was limited to otherwise applicable nonbankruptcy laws "relating to financial condition."
 
 
 4
 We reverse the decision of the district court and remand for further proceedings.
 
 I. Background
 
 5
 Appellee Pacific Gas & Electric Company ("PG & E") is a large, vertically-integrated public utility in California, currently subject to regulation by various federal, state, and local entities. PG & E owns and operates electric generation facilities, electric and gas transmission facilities, and retail distribution facilities. On April 6, 2001, PG & E filed a voluntary petition under Chapter 11 of the Bankruptcy Code. On December 19, 2001, PG & E and its corporate parent PG & E Corporation ("Proponents") filed a First Amended Reorganization Plan ("Plan") accompanied by a First Amended Disclosure Statement. The Plan has since been amended, but the amendments do not affect our legal analysis.
 
 
 6
 Among other things, the Plan contains a proposal for the disaggregation of PG & E into four new corporations, each of which would be owned by PG & E's parent corporation. The four proposed corporations are: (1) Electric Generation LLC ("Gen"), which would own PG & E's generation assets; (2) ETrans LLC ("ETrans"), which would own PG & E's electric transmission assets; (3) GTrans LLC ("GTrans"), which would own PG & E's gas transmission assets; and (4) Reorganized PG & E, which would engage in retail distribution of electricity and gas. Pursuant to the Plan, Reorganized PG & E would remain subject to regulation by the California Public Utility Commission ("CPUC") after the proposed disaggregation. However, Gen, ETrans, and GTrans would not. Rather, they would be subject to the exclusive regulatory jurisdiction of the Federal Energy Regulatory Commission. If PG & E is not disaggregated, all of PG & E would remain subject to regulation by the CPUC.
 
 
 7
 The Disclosure Statement filed in conjunction with the Plan makes clear the extremely broad preemptive effect PG & E attributes to the "notwithstanding" clause of § 1123(a). Section 1123(a)(5) provides, in part, "[n]otwithstanding any otherwise applicable non-bankruptcy law, a [reorganization] plan shall ... provide adequate means for the plan's implementation[.]" In accordance with Proponents' reading of § 1123(a)(5), the Disclosure Statement ("Statement") describes the means proposed for implementing the Plan, and states that the Plan preempts various state and local laws:
 
 
 8
 Section 1123(a) of the Bankruptcy Code preempts any otherwise applicable non-bankruptcy law that may be contrary to its provisions. Accordingly, a plan may contain certain provisions that would not normally be permitted under non-bankruptcy law. For example, section 1123(a)(5) of the Bankruptcy Code authorizes, among other things, the sale or transfer of assets by the Debtor without the consent of the State or the California Public Utilities Commission (the "CPUC").
 
 
 9
 * * *
 
 
 10
 [S]ection 1123(a) of the Bankruptcy Code preempts state regulation from interfering with the implementation and consummation of the Plan. Accordingly, the Proponents contend that the Confirmation Order approving the Plan and authorizing the transactions pursuant to the Plan will preempt "otherwise applicable nonbankruptcy law" in the following areas: (1) any approval or authorization of the CPUC or compliance with the California Public Utilities Code or CPUC rules, regulations or decisions otherwise required to transfer public utility property (including authorization to construct facilities), issue securities and implement the Plan; and (2) the exercise of discretion by any other state or local agency or subdivision to deny the transfer or assignment of any of the Debtor's property, including existing permits or licenses, or the issuance of identical permits and licenses on the same terms and conditions as the Debtor's existing permits and licenses where both the Reorganized Debtor and one or more of ETrans, GTrans and Gen require such permit for their post Effective Date operations. Such preemption pursuant to section 1123(a) of the Bankruptcy Code shall occur at the time the Plan is implemented.
 
 
 11
 The Statement lists a number of specific sections of the California Public Utility Code and decisions by the CPUC that Proponents contend are preempted by the Plan pursuant to the "notwithstanding" clause of § 1123(a)(5), but the list is not exhaustive. The Statement provides, "[t]he Confirmation Order will supersede any law, regulation or rule that might otherwise apply to the Restructuring Transactions and the implementation of the Plan, whether specified here or not. The statutes, rules, orders or decisions thus preempted include, but are not limited to, the following: [listing specific statutory sections and CPUC decisions]."
 
 
 12
 The Statement also provides that otherwise applicable permitting and licensing requirements are preempted pursuant to § 1123(a)(5). Although Proponents insist in their brief that "the Plan does not seek to supercede or `preempt' federal law at all," the Statement mentions federal as well as state and local permits and licenses. The Statement provides:
 
 
 13
 The transfer or reissuance of the vast majority of permits and licenses issued by most state agencies and political subdivisions and federal agencies appears to be ministerial or governed by objective criteria that make it unlikely that the agencies could act or fail to act in a way that would interfere with consummation of the Plan. As mentioned above, the Proponents intend to follow the established procedures for the transfer or reissuance of such permits and licences. For these permits or licenses for which otherwise applicable nonbankruptcy law precludes transfer or gives state or local officials discretion to deny the transfer or reissuance, the Proponents will rely on the protection of section 1123(a) to ensure that all of the reorganized companies obtain the permits and licenses they need to operate lawfully.
 
 
 14
 Appellants, the CPUC, the State of California, the City and County of San Francisco, and the California Hydropower Reform Coalition (collectively the "California parties") object to the Plan. The California parties contend that the Plan conflicts with a number of state laws and that these laws are not preempted by § 1123(a)(5). Most important, the California parties contend that the disaggregation contemplated by the Plan would violate § 377 of the California Public Utilities Code. Section 377 was passed by the California legislature in the wake of the energy crisis that plagued the state in the summer of 2000. It provides that "no facility for the generation of electricity owned by a public utility may be disposed of prior to January 1, 2006." Cal. Pub. Util.Code § 377. The California parties also contend that the Plan is subject to and potentially conflicts with other state laws. For example, they contend that some of the transactions contemplated by the Plan must be subjected to environmental review under the California Environmental Quality Act.
 
 
 15
 Appearing as an amicus, the United States also objects to the Plan. Despite Proponents' assertion that they do not intend to use the Plan to displace any federal law, the United States contends that the Plan could, during its implementation, allow one or more of the four proposed corporations to do so. For example, the United States contends that federal statutes such as the Clean Air Act and the Clean Water Act could be preempted by the Plan pursuant to Proponents' construction of § 1123(a)(5). It also contends that the otherwise applicable requirement of a federal Nuclear Regulatory Commission license could be preempted by the Plan. Outside of bankruptcy, such a license would be required before PG & E could transfer ownership of the Diablo Canyon nuclear power plant to another entity, such as the newly created EGen.
 
 
 16
 The bankruptcy court rejected what it characterized as Proponents' "across-the-board, take-no-prisoners preemption strategy." It held that "there is no express preemption of non-bankruptcy law that permits a wholesale unconditional preemption of numerous state laws, some of which are identified in the Disclosure Statement and some of which are obscured by the phrase `including but not limited to.'" The bankruptcy court concluded that some non-bankruptcy laws may be impliedly preempted by the Plan under § 1123(a)(5), but reserved any ruling on implied preemption until Proponents produced a Plan that did not depend on the broad express preemption contemplated in the First Amended Reorganization Plan.
 
 
 17
 On interlocutory appeal on the issue of express preemption, the district court reversed. It held that § 1123(a)(5) expressly preempted non-bankruptcy laws. Relying on In re Public Service Co. of New Hampshire v. New Hampshire (In re Public Service Co.), 108 B.R. 854, 891 (Bankr. D.N.H.1989), the district court held that all non-bankruptcy laws "otherwise applicable to the `restructuring transactions necessary to an effective and feasible reorganization' are expressly preempted."
 
 
 18
 Because we are "in as good a position as the district court to review the findings of the bankruptcy court," we "independently review[] the bankruptcy court's decision." Ragsdale v. Haller, 780 F.2d 794, 795 (9th Cir.1986). We review the bankruptcy court's conclusion of law de novo. Id.
 
 
 19
 We agree with the district court that a reorganization plan under Chapter 11 of the Bankruptcy Code expressly preempts otherwise applicable non-bankruptcy laws. However, we disagree with the district court as to the scope of that express preemption. We hold that the preemptive scope of a reorganization plan is stated in § 1142(a). That section provides that a plan shall be implemented "notwithstanding any otherwise applicable non-bankruptcy law, rule, or regulation relating to financial condition." That is, under § 1142(a), non-bankruptcy law is expressly preempted by a reorganization plan only to the extent that such law "relat[es] to financial condition."
 
 
 20
 Neither the bankruptcy court nor the district court applied the standard of express preemption contained in § 1142(a). We therefore reverse the decision of the district court and remand for further proceedings consistent with this opinion.
 
 II. Section 1123(a)(5), Section 1142(a), and the "Notwithstanding" Clauses
 A. Section 1123(a)(5)
 
 21
 Section 1123(a)(5) has deep roots. In its original form, § 1123(a)(5) was § 77B(b)(9) of the Bankruptcy Act of 1898, added by amendment in 1934. Section 77B(b)(9) provided, in part:
 
 
 22
 A plan of reorganization ... shall provide adequate means for the execution of the plan, which may include the transfer of all or any part of the property of the debtor to another corporation or to other corporations, or the consolidation of the properties of the debtor with those of another corporation or corporations, or the retention of the property by the debtor, the distribution of assets among creditors or any class thereof, the satisfaction or modification of liens, indentures, or other similar instruments....
 
 
 23
 Bankruptcy Act of 1898 Amendments, Pub.L. No. 73-296, 48 Stat. 911, 913-14 (1934) (emphasis added). Four years later, § 77B(b)(9) was recodified as § 216(10) and slightly modified to read, in part:
 
 
 24
 A plan of reorganization ... shall provide adequate means for the execution of the plan, which may include: the retention by the debtor of all or any part of its property; the sale or transfer of all or any part of its property to one or more other corporations theretofore organized or thereafter to be organized; the merger or consolidation of the debtor with one or more other corporations; the sale of all or any part of its property, either subject to or free from any lien, at not less than a fair upset price and the distribution of all or any assets, or the proceeds derived from the sale thereof, among those having an interest therein; the satisfaction or modification of liens; the cancelation or modification of indentures or of other similar instruments....
 
 
 25
 Bankruptcy Act of 1898 Amendments, Pub.L. No. 75-696, 52 Stat. 840, 895-96 (1938) (emphasis added).
 
 
 26
 Section 1123(a)(5) is the direct successor to §§ 77B(b)(9) and 216(10). It was originally enacted as part of the Bankruptcy Reform Act of 1978 (now commonly referred to as the Bankruptcy Code). In its original form, as enacted in 1978, § 1123(a)(5) provided, in part:
 
 
 27
 (a) A plan shall—
 
 
 28
 * * *
 
 
 29
 (5) provide adequate means for the plan's execution, such as —
 
 
 30
 (A) retention by the debtor of all or any part of the property of the estate;
 
 
 31
 
 (B) transfer of all or any part of the property of the estate to one or more entities, whether organized before or after the confirmation of such plan;
 
 
 
 32
 (C) merger or consolidation of the debtor, with one or more persons;
 
 
 33
 
 (D) sale of all or any part of the property of the estate, either subject to or free of any lien, or the distribution of all or any part of the property of the estate among those having an interest in such property of the estate;
 
 
 
 34
 (E) satisfaction or modification of any lien;
 
 
 35
 (F) cancellation or modification of any indenture or similar instrument;....
 
 
 36
 An Act to Establish a Uniform Law on the Subject of Bankruptcies, Pub.L. No. 95-598, § 1123(a)(5), 92 Stat. 2549, 2631-32 (1978) (emphasis added).
 
 
 37
 The emphases are added to all three statutes to highlight subsections 1123(a)(5)(B) and (5)(D) and their predecessor subsections. Proponents particularly rely on subsections 1123(a)(5)(B) and (5)(D) to support their argument for the preemptive effect of their Plan. These subsections have been largely unchanged since the addition of § 77B(b)(9) to the 1898 Bankruptcy Act by amendment in 1934.
 
 
 38
 Less than a year after the effective date of the 1978 Bankruptcy Code, the House Judiciary Committee reported favorably on S. 658, a bill that would have made minor amendments to the Code, including to § 1123(a)(5), The relevant provisions of S. 658 were later incorporated into S. 863 and passed by the Senate (but not the Cong. (1979)); S. 863, 97th Cong. (1981). In the words of the Committee's Report, S. 658 was designed "to correct technical errors, clarify and make minor substantive changes to [the 1978 Code]." Staff of House Comm. on the Judiciary, An Act to Correct Technical Errors, Clarify and Make Minor Substantive Changes to Public Law 95-598, H.R.Rep. No. 96-1195, at 1 (1980). The Report summarized as follows the problems S. 658 was designed to address:
 
 
 39
 The Bankruptcy Reform Act of 1978 has now been in effect less than one year. It is clear even at this early time in the life of this law that technical amendments are required. Errors in printing, spelling, punctuation, grammar, syntax, and numeration arose in the bill as enacted because of the last-minute process of change through which the bill went when considered at the closing sessions of the 95th Congress.
 
 
 40
 These same last-minute changes also resulted in the enactment of a bill that contains incongruent provisions; material that was removed from earlier versions remained as either cross-references or antecedents for provisions changed or inserted. And, material added often was not completely integrated into the total fabric of the bill as enacted.
 
 
 41
 Such matters constitute the vast majority of the subject of the Technical Amendments Act. In addition, however, there are several items of a substantial nature which are included because: (1) it was intended that the particular subject was to be dealt with at the earliest possible time after the enactment of the Bankruptcy Reform Act in connection with whatever technical amendments would be considered; (2) further conforming changes were found to be necessary to complete the legislative work intended by the Bankruptcy Reform Act; (3) the treatment of a subject in the Bankruptcy Reform Act was found to be incomplete; or (4) there was overlooked some minor yet relevant matter. In each case the change proposed is consistent with policies adopted by Congress in its enactment of the Bankruptcy Reform Act.
 
 
 42
 Id. at 1-2 (emphasis added).
 
 
 43
 Among the amendments contained in S. 658 were the following proposed changes to § 1123(a) and (a)(5). First, the phrase "A plan shall" of § 1123(a) would have been amended to read "Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall." Second, the word "execution" of § 1123(a)(5) would have been replaced by "implementation." Senate Bill 658 also would have made several other minor word changes to § 1123. H.R.Rep. No. 96-1195, at 122. The Committee Report described the proposed changes to § 1123 as follows:
 
 
 44
 This amendment makes it clear that the rules governing what is to be contained in the reorganization plan are those specified in this section; deletes a redundant word; and makes several stylistic changes.
 
 
 45
 Id. at 22.[1] S. 658 was never passed by the Senate.
 
 
 46
 In 1983, the same proposed amendments to § 1123(a) were passed by the Senate as part of S. 445. S. 445, 98th Cong. (1983). When S. 445 was reported out by the Senate Judiciary Committee, the Committee Report stated that the amendments "make technical stylistic changes." S.Rep. No. 9865, at 84 (1983). On the floor of the Senate, S. 445 was combined with S. 1013, a bill containing other proposed amendments to the Bankruptcy Code. 129 Cong. Rec. 9968 (1983). The amendments to § 1123 from S. 445 became Subtitle I of S. 1013, entitled "Technical Amendments to Title 11." 129 Cong. Rec. 9986 (1983). Senator Dole, on the Senate floor, described this newly added subtitle as containing provisions designed to "correct grammatical, punctuation, and spelling errors in the code, clarify the intent of the drafters in certain sections, and generally refine procedures." 129 Cong. Rec. 9970 (1983). S. 1013 was passed by the Senate, but not by the House.
 
 
 47
 The proposed amendments to § 1123 that had been contained in S. 658 in 1979, in S. 863 in 1981, and in S. 445 and S.1013 in 1983, were finally passed by both houses in 1984. No committee reports were prepared, and the amendments were not mentioned on the floors of the two houses. The amendments to § 1123 eventually became law in 1984, and were contained in the conference bill in a subtitle headed "Miscellaneous Amendments to Title 11." Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98-353, § 507, 98 Stat. 333, 385 (1984); 130 Cong. Rec. 20217, 20222 (1984).
 
 
 48
 As a result of the 1984 amendments, § 1123(a)(5) now provides, in the subsections upon which Proponents particularly rely:
 
 
 49
 (a) Notwithstanding any otherwise applicable non-bankruptcy law, a plan shall —
 
 
 50
 * * *
 
 
 51
 (5) provide adequate means for the plan's implementation, such as —
 
 
 52
 * * *
 
 
 53
 (B) transfer of all or any part of the property of the estate to one or more entities, whether organized before or after the confirmation of such plan;
 
 
 54
 * * *
 
 
 55
 (D) sale of all or any part of the property of the estate, ....
 
 
 56
 (Emphasis added.) The italics indicate words added or changed by the 1984 amendment.
 
 B. Section 1142(a)
 
 57
 Section 1142(a) has equally deep roots. The early predecessor to § 1142(a) was § 77B(h), added to the Bankruptcy Act of 1898 by amendment in 1934. That section provided, in relevant part:
 
 
 58
 Upon final confirmation of the plan, the debtor and other corporation or corporations organized or to be organized for the purpose of carrying out the plan, shall have full power and authority to, and shall put into effect and carry out the plan and the orders of the judge relative thereto, under and subject to the supervision and control of the judge[.]
 
 
 59
 Bankruptcy Act of 1898 Amendments, Pub.L. No. 73-296, 48 Stat. 911, 920 (1934).
 
 
 60
 Four years later, § 77B(h) was recodified as § 224(2), which provided:
 
 
 61
 Upon confirmation of a plan [] the debtor and every other corporation organized or to be organized for the purpose of carrying out the plan shall comply with the provisions of the plan and with all orders of the court relative thereto and shall take all action necessary to carry out the plan, including, in the case of a public-utility corporation, the procuring of authorization, approval, or consent of each commission having regulatory jurisdiction over the debtor or such other corporation[.]
 
 
 62
 Bankruptcy Act of 1898 Amendments, Pub.L. No. 75-696, 52 Stat. 840, 898 (1938) (emphasis added).
 
 
 63
 Section 1142(a) is the direct successor to §§ 77B(h) and 224(2). Like § 1123(a)(5), it was originally enacted as part of the 1978 Bankruptcy Code. The heading for the whole of § 1142 was "Execution of Plan." Section 1142(a) provides, in its entirety:
 
 
 64
 Notwithstanding any otherwise applicable nonbankruptcy law, rule, or regulation relating to financial condition, the debtor and any entity organized or to be organized for the purpose of carrying out the plan shall carry out the plan and shall comply with any orders of the court.
 
 
 65
 (Emphasis added.) The italicized clause in § 224(2), requiring, "in the case of a public-utility," the procuring of "authorization, approval, or consent" of regulatory commissions, was eliminated in § 1142. The italicized clause in § 1142(a) — the "notwithstanding" clause — was added.
 
 
 66
 There is little legislative history that provides background for the addition of the "notwithstanding" clause in § 1142(a). Section 1142(a) is mentioned in neither the House nor the Senate Committee Reports. See S.Rep. No. 95-989 (1978); H.R.Rep. No. 95-595 (1978). The only mention is by Senator DeConcini, in his capacity as the Chair of the Subcommittee on Improvements in Judicial Machinery of the Senate Judiciary Committee. Senator DeConcini mentioned §§ 1123(a) and 1142(a) together, as part of a lengthy statement on the Senate floor, covering twenty-seven pages of the Congressional Record. The totality of what he said concerning either §§ 1123(a) or 1142(a) is as follows:
 
 
 67
 Section 1123 of the House amendment represents a compromise between similar provisions in the House bill and Senate amendment. The section has been clarified to clearly indicate that both secured and unsecured claims, or either of them, may be impaired in a case under title 11. Moreover, section 1123(a)(1) has been substantively modified to permit classification of certain kinds of priority claims. This is important for purposes of confirmation under section 1129(a)(9).
 
 
 68
 Section 1123(a)(5) of the House amendment is derived from a similar provision in the House bill and Senate amendment but deletes the language pertaining to "fair upset price" as an unnecessary restriction.[2] Section 1123 is also intended to indicate that a plan may provide for any action specified in section 1123 in the case of a corporation without a resolution of the board of directors. If the plan is confirmed, then any action proposed in the plan may be taken notwithstanding any otherwise applicable nonbankruptcy law in accordance with section 1142(a) of title 11.
 
 
 69
 124 Cong. Rec. 34005 (1978).
 
 
 70
 Section 1142(a) was not substantially changed by the amendments to the Bankruptcy Code enacted in 1984. The amendment eliminated a comma that had followed the phrase "carry out the plan." It also changed the heading for § 1142 from "Execution of the Plan" to "Implementation of the Plan." Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353, 98 Stat. 333, 387 (1984). This change matched the 1984 amendment of § 1123(a)(5), which changed "adequate means for the plan's execution" to "adequate means for the plan's implementation."
 
 
 71
 C. Proponents' Reading of Section 1123(a)(5) as Independent from Section 1142(a)
 
 
 72
 Proponents ask us to hold that provisions of PG & E's Reorganization Plan drafted pursuant § 1123(a)(5) — in particular, subsections (a)(5)(B) and (a)(5)(D) — broadly preempt otherwise applicable nonbankruptcy laws with which the Plan conflicts. They ask us, in order to reach that holding, to read the "notwithstanding" clause of § 1123(a)(5) independently from, and more broadly than, the "notwithstanding" clause of § 1142(a). For the reasons that follow, we do not agree that these two clauses can be read independently. Rather, we hold that the clauses must be read together, and that the express preemption of § 1123(a)(5) is limited to otherwise applicable nonbankruptcy laws "relating to financial condition," as specified in § 1142(a).
 
 
 73
 Proponents also ask that we hold provisions of the Plan broadly preempt conflicting California law because, they argue, Congress intended preemption specifically with respect to reorganization plans of public utilities. They urge that we find evidence for this intention in the failure to reenact as part of § 1142(a), the language of its predecessor § 224(2) requiring the approval of relevant regulatory commissions when a public utility files for bankruptcy. The elimination of this language in enacting § 1142(a), however, cannot be construed as evidence of a broad congressional intent to preempt the state regulatory laws, even with respect to public utilities. Section 1142(a), unlike its predecessor § 224(2), does not refer to public utilities in any way. A special requirement that once existed for public utilities is gone. Section 1142(a), in its current form, simply does not distinguish between public utilities and other debtors.
 
 
 74
 III. Relevant Principles of Statutory Construction
 
 
 75
 The centerpiece of any preemption analysis is congressional purpose. "The purpose of Congress is the ultimate touchstone." Retail Clerks Int'l Ass'n v. Schermerhorn, 375 U.S. 96, 103, 84 S.Ct. 219, 11 L.Ed.2d 179 (1963). After quoting this "oft-repeated comment" from Schermerhorn, the Supreme Court recently wrote, "[a]s a result, any understanding of the scope of a pre-emption statute must rest primarily on `a fair understanding of congressional purpose.'" Medtronic, Inc. v. Lohr, 518 U.S. 470, 485-86, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (citation omitted) (italics in original). To determine congressional purpose, "we look to the statute's language, structure, subject matter, context, and history — factors that typically help courts determine a statute's objectives and thereby illuminate its text." Almendarez-Torres v. United States, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998); see also Medtronic, 518 U.S. at 486, 116 S.Ct. 2240 ("Congress' intent, of course, primarily is discerned from the language of the pre-emption statute and the `statutory framework' surrounding it. Also relevant, however, is the `structure and purpose of the statute as a whole[.]'")(internal citations omitted).
 
 
 76
 Two presumptions assist us in determining congressional purpose in this case. The first is a general presumption, applicable in all preemption cases. The second is a presumption specific to cases decided under the Bankruptcy Code.
 
 
 77
 First, we presume that Congress does not undertake lightly to preempt state law, particularly in areas of traditional state regulation.
 
 
 78
 [B]ecause the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action. In all pre-emption cases, and particularly in those in which Congress has `legislated ... in a field which the States have traditionally occupied,' we `start with the assumption that the historic police powers of the States were not to be superceded by the Federal Act unless that was the clear and manifest purpose of Congress.'
 
 
 79
 Medtronic, 518 U.S. at 485, 116 S.Ct. 2240 (internal citation omitted). As the Court stated in Cipollone v. Liggett Group, Inc., 505 U.S. 504, 518, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), in refusing to find state tort damage actions preempted by a federal cigarette labeling and advertising requirement, "we must construe these provisions [of federal law] in light of the presumption against the pre-emption of state police power regulations."
 
 
 80
 Even though bankruptcy is one of only two federal legislative powers in Article I, Section 8 of the Constitution in which the power to make "uniform" laws is made explicit, the presumption against displacing state law by federal bankruptcy law is just as strong in bankruptcy as in other areas of federal legislative power. In Midlantic National Bank v. New Jersey Department of Environmental Protection, 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986), the question addressed was whether bankruptcy law displaced state environmental law. The Court emphasized that if Congress wished to grant an exemption from otherwise applicable nonbankruptcy state law, "`the intention would be clearly expressed.'" Id. at 501, 106 S.Ct. 755 (citation omitted). Similarly, in BFP v. Resolution Trust Corp., 511 U.S. 531, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994), the Court refused to construe bankruptcy law so as to interfere with the operation of a foreclosure sale conducted under state law. "To displace traditional state regulation in such a manner, the federal statutory purpose must be `clear and manifest.'" Id. at 544, 114 S.Ct. 1757 (citation omitted).
 
 
 81
 Second, we presume, absent clear indications to the contrary, that Congress did not intend to change preexisting bankruptcy law or practice in adopting the Bankruptcy Code in 1978 or in amending it in 1984. The Supreme Court, in a remarkably consistent series of cases, has explicitly and repeatedly relied on this presumption. The first case is a bankruptcy preemption case; the others are straight bankruptcy cases.
 
 
 82
 In Midlantic, the question addressed was whether, under 11 U.S.C. § 554(a), a bankruptcy trustee could abandon burdensome real property and thereby entirely preempt state-law obligations — such as required environmental clean-up — attached to that property. Section 554(a) was enacted as part of the 1978 Code and was amended slightly in 1984. Prior to the adoption of § 554(a), a trustee could not entirely escape state-law obligations by abandoning property. However, § 554(a) explicitly authorized abandonment by the trustee and did not mention any state-law limitation on abandonment. The Court rejected an argument by the trustee that § 554(a) evidenced a congressional purpose to depart from prior bankruptcy practice and entirely to preempt state environmental law obligations:
 
 
 83
 If Congress wishes to grant the trustee an extraordinary exemption from non-bankruptcy law, "the intention would be clearly expressed, not left to be collected or inferred from disputable considerations of convenience in administering the estate of the bankrupt."
 
 
 84
 * * *
 
 
 85
 Neither the Court nor Congress has granted a trustee in bankruptcy powers that would lend support to a right to abandon property in contravention of state or local laws designed to protect public health or safety.
 
 
 86
 474 U.S. at 501-02, 106 S.Ct. 755 (citation omitted).
 
 
 87
 In Kelly v. Robinson, 479 U.S. 36, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986), the question addressed was whether 11 U.S.C. § 523(a)(7), also enacted as part of the 1978 Code, excepted from discharge a restitution order in a state criminal case in a Chapter 7 bankruptcy. Under pre-Code law, there was no such exception, despite statutory language arguably to the contrary. "Congress enacted the Code in 1978 against the background of an established judicial exception to discharge for criminal sentences, including restitution orders[.]" Id. at 46, 107 S.Ct. 353. As an aid to construction, the Court quoted from Midlantic:
 
 
 88
 The normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific. The Court has followed this rule with particular care in construing the scope of bankruptcy codifications.
 
 
 89
 Id. at 47, 107 S.Ct. 353 (quoting Midlantic, 474 U.S. at 501, 106 S.Ct. 755) (emphasis added). Relying in part on the "absence of any significant evidence that Congress intended to change the law," id. at 53, 107 S.Ct. 353, the Court declined to interpret § 523(a)(7) as a departure from pre Code law:
 
 
 90
 In light of the strong interests of the States, the uniform construction of the old Act over three-quarters of a century, and the absence of any significant evidence that Congress intended to change the law in his area, we believe this result best effectuates the will of Congress.
 
 
 91
 
 Id.
 
 
 
 92
 In United Savings Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd., 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), the question addressed was whether another provision enacted as part of the 1978 Code, 11 U.S.C. § 362(d)(1), allowed compensation to undersecured creditors for delays in foreclosing on their collateral that resulted from the operation of the automatic stay. Under pre-Code law, such compensation was not available. As part of its analysis, the Court relied on the lack of any specific provision in the statute and any indication in the legislative history that Congress intended to depart from the prior law:
 
 
 93
 Such a major change in the existing rules would not likely have been made without specific provision in the text of the statute; it is most improbable that it would have been made without even any mention in the legislative history.
 
 
 94
 Id. at 380, 108 S.Ct. 626 (internal citation omitted).
 
 
 95
 In Dewsnup v. Timm, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992), the question addressed was whether 11 U.S.C. § 506(d), enacted as part of the 1978 Code, allowed a debtor to "strip down" a creditor's lien on the value of real property. Under pre-Code law, stripping down was not allowed. Because § 506(d) was ambiguous, and because there was no indication in the legislative history that a major change was intended, the Court refused to interpret § 506(d) to change the prior law:
 
 
 96
 [G]iven the ambiguity in the text [of § 506(d)], we are not convinced that Congress intended to depart from the pre-Code rule that liens pass through bankruptcy unaffected.
 
 
 97
 * * *
 
 
 98
 When Congress amends the bankruptcy laws, it does not write `on a clean slate.' Furthermore, this Court has been reluctant to accept arguments that would interpret the Code, however vague the particular language under consideration might be, to effect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history.
 
 
 99
 Id. at 417, 419, 112 S.Ct. 773 (internal citation omitted).
 
 
 100
 Finally, in Cohen v. de la Cruz, 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998), the question addressed was whether 11 U.S.C. § 523(a)(2)(A) excepts from discharge a treble damage award obtained in a suit based on the debtor's fraud. Section 523(a)(2)(A) was enacted as part of the 1978 Code, and was amended in 1984. As enacted in 1978, § 523(a)(2)(A) read:
 
 
 101
 (a) A discharge ... does not discharge an individual debtor from any debt —
 
 
 102
 * * *
 
 
 103
 (2) for obtaining money, property, services, or ... credit, by —
 
 
 104
 (A) false pretenses, a false representation, or actual fraud[.]
 
 
 105
 (Emphasis added.) After the 1984 amendment, § 523(a)(2)(A) read:
 
 
 106
 (a) A discharge ... does not discharge an individual debtor from any debt—
 
 
 107
 * * *
 
 
 108
 (2) for money, property, services, or... credit,... to the extent obtained by —
 
 
 109
 (A) false pretenses, a false representation, or actual fraud[.]
 
 
 110
 (Emphasis added.) The debtor argued that the phrase "to the extent obtained by," added by the 1984 amendment, meant that the non-dischargeable portion of his fraud-related debt was limited to amounts obtained by the fraud itself, and did not extend to a treble damage award based on the fraud. Considered solely as a textual matter, divorced from context and history, the debtor's argument was a very plausible interpretation of amended § 523(a)(2)(A).
 
 
 111
 The Court nonetheless rejected the debtor's argument. It noted that the pre-Code version of the fraud exception to nondischargeability contained no exclusion for treble damage awards, and that § 523(a)(2)(A), as it was enacted in 1978, also contained no such exclusion. The debtor's argument depended entirely on Congress's addition in 1984 of the phrase "to the extent obtained by," which the legislative history had characterized only as a "stylistic change." The Court held that this was not enough:
 
 
 112
 As the result of a slight amendment to the language in 1984, referred to in the legislative history only as a "stylistic change," § 523(a)(2)(A) now excepts from discharge "any debt ... for money, property, services, or ... credit, to the extent obtained by... false pretenses, a false representation, or actual fraud." We, however, "will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure," and the change to the language of § 523(a)(2)(A) in 1984 in no way signals an intention to narrow the established scope of the fraud exception along the lines suggested by petitioner. If, as petitioner contends, Congress wished to limit the exception ..., one would expect Congress to have made unmistakably clear its intent[.]
 
 
 113
 Id. at 221-22, 118 S.Ct. 1212 (citations omitted).
 
 
 114
 IV. Express Preemption under Section 1123(a)(5) and 1142(a)
 
 
 115
 The phrase "notwithstanding any otherwise applicable nonbankruptcy law" in § 1123(a) indicates that Congress intended that there be express preemption under § 1123(a). The "notwithstanding" formulation is commonly used in other parts of the Bankruptcy Code to indicate express preemption, and there is little reason to think that it is used in § 1123(a) to indicate anything else. See, e.g., 11 U.S.C. § 363(b)(2)(A)("notwithstanding subsection (a) of [section 7A of the Clayton Act]") and (b)(2)(B) ("notwithstanding subsection (b) of [section 7A of the Clayton Act]"); § 365(e)(1) ("Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified[.]"), (f)(1) ("notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law"), and (f)(3)("Notwithstanding a provision in... applicable law that terminates or modifies... such contract or lease. . . ."); § 1124(2) ("notwithstanding any ... applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment"); § 1142(a) ("Notwithstanding any otherwise applicable nonbankruptcy law, rule or regulation relating to financial condition...."). The issue is thus not whether there is express preemption under § 1123(a), but rather its extent. As the Court phrased it in Medtronic, our task is to determine the "scope of the statute's pre-emption." 518 U.S. at 485, 116 S.Ct. 2240.
 
 
 116
 Section 1123(a) specifies, in seven subsections, what a reorganization plan in a Chapter 11 bankruptcy must do. (Section 1123(b), which is not before us, specifies what such a plan may do.) Subsection 1 requires a plan to designate classes of claims. Subsection 2 requires a plan to specify any class of claims or interests that is not impaired under the plan. Subsection 3 requires that the plan specify the treatment of any impaired class of claims or interests. Subsection 4 requires that the plan provide for the same treatment of claims or interests within a particular class, unless a holder of a particular claim or interest agrees otherwise. Subsection 5, at issue in this case, requires that the plan "provide adequate means for the plan's implementation." Subsection 6 requires that the plan provide for inclusion in a debtor corporation's charter provisions that prohibit the issuance of nonvoting securities and that provide for "appropriate distribution" of voting interests among classes of securities. Finally, subsection 7 requires that the plan contain only provisions that are consistent with the interests of creditors and equity security holders, and with public policy with respect to selection of officers, directors and trustees.
 
 
 117
 Sections 1123(a) and 1142(a) were enacted at the same time, as part of the 1978 Bankruptcy Code. Both sections are directly concerned with the contents and implementation of a reorganization plan under Chapter 11. Section 1123(a) specifies what a confirmable plan must do. Among other things, under § 1123(a)(5) it must "provide for adequate means for the plan's implementation." Section 1142(a) in turn describes the duty of an entity charged with implementing a confirmed plan. As enacted in 1978, § 1142(a) contained an express preemption clause providing that those charged with implementing a confirmed plan could perform that duty "notwithstanding any otherwise applicable nonbankruptcy law, rule, or regulation relating to financial condition." As enacted in 1978, § 1123(a) contained no such clause.
 
 
 118
 When the 1984 amendments to the Bankruptcy Code were adopted, there was absolutely no indication that those amendments were intended by Congress to make any important changes to the 1978 Code. As stated generally by the House Judiciary Committee Report prepared in 1980, in connection with what eventually became the 1984 amendments, "In each case the change proposed is consistent with policies adopted by Congress in its enactment of the Bankruptcy Reform Act [of 1978]." House Comm. on the Judiciary, An Act to Correct Technical Errors, Clarify and Make Minor Substantive Changes to Public Law 95-598, H.R.Rep. No. 96-1195, at 1 (1980). The Committee Report stated specifically with respect to the proposed amendment of § 1123(a), "[t]he amendment makes it clear that the rules governing what is to be contained in the reorganization are those specified in this section; deletes a redundant word; and makes several stylistic changes." Id. at 22. True to the title it appeared under in 1983, the 1984 amendment to § 1123(a) was purely "technical." Subtitle I-Technical Amendments to Title 11, S. 1013, 129 Cong. Rec. 9986 (1983).
 
 
 119
 It is thus clear that the addition of the "notwithstanding" clause by amendment in 1984 was not intended by Congress to make any substantial change to the 1978 Code. In particular, it is clear that the "notwithstanding" clause of § 1123(a) was not intended to change the express preemptive effect of a confirmable reorganization plan. The 1978 Code had already indicated in § 1142(a) the express preemptive effect of a confirmed reorganization plan: The plan is to be implemented "notwithstanding any otherwise applicable nonbankruptcy law, rule, or regulation relating to financial condition." As we read the 1984 amendment to § 1123(a), the newly added "notwithstanding" clause was intended to be coextensive with the already-existing "notwithstanding" clause of § 1142(a).
 
 
 120
 Our conclusion is based not only on the presumption that Congress would not have made an important change in the Code without clearly indicating its intent to do so. See, e.g., Midlantic, 474 U.S. 494, 106 S.Ct. 755 (1986); de la Cruz, 523 U.S. 213, 118 S.Ct. 1212 (1998). Our conclusion is also based on the overall structure of the Code. It makes perfect sense that the express preemptive scope of what must be included in a confirmable plan, specified in § 1123(a), would be the same as the express preemptive scope of what is actually included in a confirmed plan, specified in § 1142(a). It also makes perfect sense that the express preemptive scope of what must be in a confirmable and confirmed plan would be laws "relating to financial condition."
 
 
 121
 Our conclusion is reinforced by the legislative history and actual language of §§ 1123(a) and 1142(a) in the 1978 Act and 1984 amendments. In his floor statement leading up to the adoption of the 1978 Act, Senator DeConcini explicitly linked the prescribed contents of a confirmable plan under § 1123(a) and the preemptive effect of a confirmed plan under § 1142(a). Senator DeConcini nowhere in his lengthy statement discussed §§ 1123(a) and 1142(a) independently from one another. Two years later, in 1980, the House Committee Report stated that proposed legislation, which was eventually enacted as the 1984 amendment to § 1123(a), "makes clear that the rules governing what is to be contained in the reorganization plan are those specified in this section." The addition of the "notwithstanding" clause to § 1123(a) thus made clear that the rules governing what must be in a confirmable plan are contained in § 1123(a) and not in otherwise applicable nonbankruptcy laws. That is, a plan proposed in conformity with § 1123(a) could be confirmed, and a confirmed plan would then have the preemptive effect precisely specified in § 1142(a).
 
 
 122
 Further, the phrase "adequate means for the plan's execution" used in the 1978 text of § 1123(a) was changed to "adequate means for the plan's implementation" by the 1984 amendment. At the same time, in a parallel change of wording in § 1142(a), the heading "Execution of the Plan" used as the heading for the 1978 text of § 1142(a) was changed to "Implementation of the Plan" by the 1984 amendment. We regard these parallel word changes in §§ 1123(a) and 1142(a) as additional evidence that Congress had both of these sections in mind during the 1984 amending process, and that it intended that the two sections be read in a parallel or complementary manner.
 
 
 123
 We therefore conclude that the "notwithstanding" clause of § 1123(a) expressly preempts otherwise applicable nonbankruptcy law, and that the scope of that express preemption is the same as under the "notwithstanding" clause of § 1142(a). Otherwise applicable nonbankruptcy laws "relating to financial condition" are expressly preempted under both §§ 1123(a) and 1142(a). The bankruptcy court did not apply this express preemption standard to Proponents' Plan. We believe that it is most appropriate for the bankruptcy court to apply this standard in the first instance. We therefore remand for that determination.
 
 V. Implied Preemption
 
 124
 Express and implied preemption under the Bankruptcy Code are two distinct concepts. It is possible for there to be no express preemption under a particular provision of the Bankruptcy Code, but nonetheless to be implied preemption under the Code. In Midlantic, for example, the Supreme Court held that there was no express preemption of state environmental law under 11 U.S.C. § 554, but did not reach the question "whether certain state laws imposing conditions on abandonment may be so onerous as to interfere with the bankruptcy adjudication itself[.]" 474 U.S. at 507, 106 S.Ct. 755. Similarly, in Baker & Drake, Inc. v. Public Service Commission of Nevada (In re Baker & Drake, Inc.), 35 F.3d 1348 (9th Cir.1994), we analyzed a confirmed plan under an implied preemption analysis, stating the test as whether "state law `stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" Id. at 1353 (citations omitted). The bankruptcy court did not reach the question of implied preemption, and that question is not before us in this interlocutory appeal.
 
 VI. Conclusion
 
 125
 We hold that the scope of preemption under the "notwithstanding" clause of § 1123(a) is the same as under the "notwithstanding" clause of § 1142(a), and that otherwise applicable nonbankruptcy laws "relating to financial condition" are expressly preempted under both §§ 1123(a) and 1142(a). Neither the bankruptcy court nor the district court used the express preemption standard stated in the "notwithstanding" clause of § 1142(a) and referred to in the "notwithstanding" clause of § 1123(a). We reverse the decision of the district court. We remand to the bankruptcy court for a determination of whether the laws Proponents propose to preempt in their Plan come within the express preemption of §§ 1123(a) and 1142(a). The question of implied preemption under § 1123(a) will also be before the bankruptcy court on remand.
 
 
 126
 REVERSED AND REMANDED.
 
 
 
 Notes:
 
 
 *
 The Honorable Samuel P. King, Senior District Judge for Hawaii, sitting by designation
 
 
 [1]
 The numeration in this section of the Committee Report refers, presumably inadvertently, to the numeration of the bill in its incarnation as S. 863, not S. 658. The content of the sections referred to in both bills is identical in all relevant aspectsSee H.R.Rep. No. 95-598, at 22; S. 863 § 102(a).
 
 
 [2]
 The Norton bankruptcy treatise indicates that in referring to § 1123(a)(5) Senator DeConcini was actually referring to what became § 1123(a)(6) in the enacted statute. This is incorrect. Senator DeConcini was, in fact, referring to what became § 1123(a)(5), for the "fair upset price" language, which Senator DeConcini says was deleted as unnecessary, was in § 216(10), the immediate predecessor to § 1123(a)(5). Section 1123(a)(6) was entirely newSee 8 William L. Norton, Norton Bankruptcy Law and Practice 2d 1119 (2002).